## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES of AMERICA *ex. rel.* LISA HERZOG, | : <br> : Civil A. No. <br> : |
| Plaintiff/Relator, | : <br> : **JURY TRIAL DEMANDED** <br> : |
| v. | : <br> : |
| STEWARD EASTON HOSPITAL, STEWARD HEALTH CARE, LLC, MANEESH AILAWADI, M.D., FSSO, JOHN J. SCAFFIDI, JR., M.D. AND LEHIGH VALLEY WEIGHT LOSS, | : <br> : **FILED UNDER SEAL PURSUANT** <br> : **TO 31 U.S.C. § 3730(b)(2)** <br> : <br> : **DO NOT POST ON PACER** |
| Defendants. | : <br> : |

## COMPLAINT FOR DAMAGES AND OTHER RELIEF UNDER
## THE *QUI TAM* PROVISIONS OF THE FALSE CLAIMS ACT

Relator Lisa Herzog, on behalf of the United States of America, brings this action to recover damages from false claims, payment by mistake, and unjust enrichment as a result of the conduct of Steward Easton Hospital ("Easton Hospital" or the "Hospital"), Steward Health Care, Maneesh Ailawadi, M.D., FSSO, John Scaffidi, M.D. and Lehigh Valley Weight Loss (collectively, "Defendants"). Since 2018, Easton Hospital, with and through Dr. Ailawadi, knowingly submitted and caused the submission of claims to the Medicare program that were false because they resulted from violations of various federal regulations and statutes, including the physician self-referral law, 42 U.S.C. § 1395nn (commonly referred to as the "Stark Law"). In doing so, Defendants violated the False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq.*, were paid by mistake, and were unjustly enriched.

## NATURE OF ACTION

1.      Relator Lisa Herzog, on behalf of the United States of America, brings this action to

recover treble damages and civil penalties under the FCA, and to recover damages under the common law or equitable theories of payment by mistake and unjust enrichment.

2.        Within the time frames detailed below, Easton Hospital, with and through Dr. Ailawadi, systematically caused the submission of false claims for reimbursement to Government Healthcare Programs in violation of the federal False Claims Act.  Specifically, Defendants billed or caused others to bill public payers for surgeries that do not conform in material respects to Medicare and Medicaid rules designed, *inter alia,* to protect patient safety.

3.        These violations caused improper billing of Medicaid and Medicare for concurrent surgeries in  which, among other things:

- Medical necessity was manufactured;

- Patients did not meet Medicare's pre-approval requirements, including appropriate body mass index figures and/or did not attempt and/or been prescribed a weight loss plan and been unsuccessful with medical treatment for obesity;

- The Patient's surgeon (Defendant Dr. Ailawadi) did not adequately perform the surgery;

- The Patient's surgeon (Defendant Dr. Ailawadi) was not present during critical and key elements of the surgery.

4.        Virtually every surgery Easton Hospital billed to Medicare and Medicaid for Dr. Ailawadi's procedures is marked (and compromised) by at least one or more of the violations detailed above because Defendants' practices - driven by the desire to increase profits - ensure that such derelictions occur.

5.        As a result, since 2018, Defendants knowingly submitted and caused to be submitted hundreds, perhaps thousands, of false claims to the United States, which resulted in millions of dollars in reimbursement to Easton Hospital and the other Defendants by the Medicare program for claims that were ineligible for payment because of Defendants' unlawful conduct.

**JURISDICTION AND VENUE**

6.      Relator brings this action on behalf of herself and the United States for violations of the False Claims Act, 31 U.S.C. §§ 3729-3733.

7.      This Court has federal subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 31 U.S.C. § 3732.

8.      This Court has personal jurisdiction over Defendants, pursuant to 31 U.S.C. § 3732(a) because Defendants can be found in and transact business in this District. In addition, the acts prohibited by 31 U.S.C. § 3729 occurred in this District. 31 U.S.C. § 3732(a).

9.      Venue is proper in this District pursuant to 31 U.S.C. § 3732(a) because Defendants transact business in this District and numerous acts proscribed by 31 U.S.C. § 3729 occurred in this District.

**PRELIMINARY STATEMENT**

10.     In accordance with 31 U.S.C. § 3730(b)(2), this Complaint is being filed under Seal.

11.     Relator's claims and this Complaint are not based upon prior public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, lawsuit or investigation, in a Government Accountability Office or Auditor General's report, hearing, audit, or investigation, from the news media, or in any other location as the term "publicly disclosed" is defined in 31 U.S.C. § 3730 (e)(4)(A), amended by the Patient Protection and Affordable Care Act, Pub. L. No. 111-148, § 1313(j)(2), 124 Stat. 901-902 (2010) ("PPACA").  Moreover, Relator affirmatively disclosed the allegations herein to the United States Attorneys' Office for the Eastern District of Pennsylvania prior to filing this action.

12.     To the extent there has been a public disclosure of the information upon which the allegations of this Complaint are based that is unknown to Relator, Relator is an "original source"

of this information as defined in 31 U.S.C. § 3730(e)(4)(B), amended by the PPACA, *supra*, and similar state law provisions.

13.    Relator possesses direct and independent knowledge of the information in this Complaint.

14.    Relator's counsel voluntarily provided the United States with information related to this claim prior to filing this action. *See* 31 U.S.C. § 3730(e)(4).

## THE PARTIES

15.    Relator Lisa Herzog ("Relator") is a resident of the Commonwealth of Pennsylvania. Relator is a RN and is employed as a Surgical Services Scheduling Coordinator at Easton Hospital.

16.    Relator has worked at Easton Hospital since 1997.

17.    Defendant Steward Easton Hospital, Inc. is a 196-bed acute care teaching hospital located at 250 South 21st Street, Easton, Pennsylvania. It is professional corporation incorporated in Delaware and owned by Defendant Steward Health Care, LLC. Easton Hospital provides healthcare services to residents from several Pennsylvania counties, including residents of this District, and New Jersey.

18.    Easton Hospital was previously owned by the for-profit Community Health Systems, Inc., and sold to Steward Health Care, LLC in February 2017.

19.    Defendant Steward Health Care, LLC is the largest private, tax-paying physician-led healthcare network in the United States. Headquartered in Dallas, Texas, Steward is for-profit and operates 37 hospitals in the United States and the country of Malta.

20.    This is not Easton Hospital's first exposure to the FCA.  In December 2014, Northampton Hospital Company, LLC and Northampton Hospital Corporation, doing business as Easton Hospital, agreed to a $662,000 settlement with the government to resolve allegations of

health care fraud arising under the FCA.

21.     Defendant Maneesh Ailawadi, MD, FSSO, is a thoracic surgeon and bariatric specialist, who received privileges at Easton Hospital in or around December 2018.

22.     Dr. Ailawadi's NPI number is 1558315101. Upon information and belief, Dr. Ailawadi also apparently has surgical privileges for certain facilities in the Lehigh Valley Health Network.

23.     Dr. Ailawadi is also a partner at Defendant Lehigh Valley Weight Loss.

24.     Defendant Lehigh Valley Weight Loss, LLC is a Pennsylvania limited liability company and has locations in Allentown and Easton. *See* https://www.lehighvalleyweightloss.org/.

25.     The address for Ailawadi Surgical Associates is the same as the address for Lehigh Valley Weight Loss – 2200 Hamilton Street, Suite 111, Allentown, PA 18104.

26.     Defendant John J. Scaffidi, Jr., MD, FABOM, FACOG, is a medical doctor, specializing in aesthetics and gynecology.  Upon information and belief, Dr. Scaffidi is a resident of the Commonwealth of Pennsylvania residing at 26 Creek Court, Easton, Pennsylvania.

27.     Dr. Scaffidi is Dr. Ailawadi's partner at Lehigh Valley Weight Loss.

28.     Dr. Scaffidi maintains board certification in both Gynecology and Medical Bariatrics

## LEGAL AND REGULATORY BACKGROUND

### I.     The False Claims Act

29.     The FCA provides, in pertinent part, that any person who:

(a)(1)(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(a)(1)(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim; . . .

> (a)(1)(G) knowingly makes, uses, or causes to be made or used, a
> false record or statement material to an obligation to pay or
> transmit money or property to the Government, or knowingly
> conceals or knowingly and improperly avoids or decreases an
> obligation to pay or transmit money or property to the
> Government,
>
> is liable to the United States Government for a civil penalty of not
> less than $5,000 and not more than $10,000, as adjusted by the
> Federal Civil Penalties Inflation Adjustment Act of 1990 (28
> U.S.C. 2461 note; Public Law 104-410), plus 3 times the amount
> of damages which the Government sustains[.]

31 U.S.C. § 3729.[1]

30.    For purposes of the FCA,

> the term "knowing" and "knowingly" mean that a person, with
> respect to information (1) has actual knowledge of the information;
> (2) acts in deliberate ignorance of the truth or falsity of the
> information; or (3) acts in reckless disregard of the truth or falsity
> of the information; and require no proof of specific intent to
> defraud.

31 U.S.C. § 3729(b).

31.    The FCA defines "material" to mean "having a natural tendency to influence, or be

capable of influencing, the payment or receipt of money or property," 31 U.S.C. § 3729(b)(4).

## II.    Government Healthcare Programs

32.    In 1965, Congress enacted Title XVIII of the Social Security Act, known as the

Medicare program, to pay for the costs of certain healthcare services. HHS is responsible for

---

[1]  The FCA was amended by Public Law 111-21, the Fraud Enforcement and Recovery Act of
2009 ("FERA"), enacted May 20, 2009. Given the nature of the claims at issue, Section 3279(a)(1),
(a)(2), and (a)(7) of the prior statute, and Section 3729(a)(1)(A), (a)(1)(B), and (a)(1)(G) of the
revised statute all apply here.  Section 3729(a)(1) and (a)(7) apply to conduct that occurred before
FERA was enacted, and Section 3729(a)(1)(A) and (a)(1)(G) apply to conduct after FERA was
enacted. By virtue of Section 4(f) of FERA, Section 3729(a)(2) applies to all claims in this case
paid before June 7, 2008, and Section 3729(a)(1)(B) applies to all claims pending for payment
thereafter.

6

administering and supervising the Medicare program. CMS is a component of HHS and is directly responsible for administering the Medicare program.

33.     At all times relevant to this lawsuit, except where a different time period is specified, the following statutory and regulatory rules applied to the Medicare program:

34.     Entitlement to Medicare is based on age, disability, or affliction with end-stage renal disease. 42 U.S.C. §§ 426, 426A.

35.     The Medicare regulations define a "provider" to include "a hospital . . . that has in effect an agreement to participate in Medicare." 42 C.F.R. § 400.202.

36.     Individuals who are insured under Medicare are referred to as Medicare "beneficiaries."

37.     There are four Parts to the Medicare Program: Part A authorizes payment for institutional care, including inpatient hospital care, skilled nursing facility care, and home health care, *see* 42 U.S.C. §§ 1395c-1395i-4; Part B primarily covers outpatient care, including physician services and ancillary services, *see* 42 U.S.C. § 1395k; Part C is the Medicare Advantage Program, which provides Medicare benefits to certain Medicare beneficiaries through private health insurers, *see* 42 U.S.C. § 1395w-21 *et seq.*; and Part D provides prescription drug coverage, *see* 42 U.S.C. § 1395w-101 *et seq.*; 42 C.F.R. § 423.1 *et seq.*

38.     Since November 2006, CMS has contracted with Medicare Administrative Contractors ("MACs") to assist in the administration of Medicare Parts A and B. *See* Fed. Reg. 67960, 68181 (Nov. 2006). MACs generally act as CMS's agents in reviewing and paying Part A and Part B claims submitted by healthcare providers and perform administrative functions on a regional level. *See* 42 C.F.R. § 421.5(b); *see also* 42 U.S.C. §§ 1395h, 1395u; 42 C.F.R. §§ 421.3, 421.100, 421.104.

39.     Under the Medicare program, CMS (through MACs) makes payments

prospectively for hospital inpatient services, through periodic payments and the cost-report

reconciliation process described below, and retrospectively for hospital outpatient services, after the

services are rendered.

40.      Upon discharge of Medicare beneficiaries from a hospital, the hospital submits

Medicare Part A claims for reimbursement for inpatient items and services delivered to those

beneficiaries during their hospital stays. 42 C.F.R. §§ 413.1, 413.60, 413.64. Inpatient services are

paid using the Inpatient Prospective Payment System. In addition, designated hospital outpatient

items and services are paid under the Outpatient Prospective Payment System. Hospitals submit

claims for Medicare reimbursement using the electronic claim form known as the 837I or its paper

equivalent, Form CMS-1450 (also known as the UB-04). The claim form instructions, found in

Chapter 25, section 75 of the Claims Processing Manual, set forth the Medicare requirements for

use of the various codes in completing the form.

41.      When physicians provide patient care services in a hospital setting, whether to

hospital inpatients or outpatients, they (or an entity to which they have assigned billing rights) may

bill Medicare for their "professional" services, which include performing procedures and

interpreting test results, using a CMS Form 1500. The hospital may submit a separate claim to

Medicare for the "technical" or "facility" component of the services rendered, as described in the

preceding paragraph, under which the hospital is reimbursed for furnishing, among other things,

equipment and non-physician staff.

42.      Providers must be enrolled in Medicare in order to be reimbursed by the Medicare

program. *See* 42 C.F.R. § 424.505. To enroll in Medicare, institutional providers such as hospitals

periodically must complete a Medicare Enrollment Application (often called a Form CMS-855A).

In completing the Medicare Enrollment Application, an institutional provider certifies:

> I agree to abide by the Medicare laws, regulations and program instructions that

apply to this provider. The Medicare laws, regulations, and program instructions are available through the Medicare contractor. ***I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with such laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark Law)***, and on the provider's compliance with all applicable conditions of participation in Medicare (emphasis added).

The Medicare Enrollment Application also summarizes the False Claims Act in a separate section that explains the penalties for falsifying information in the application to "gain or maintain enrollment in the Medicare program."

43.     Medicare enrollment regulations further require providers to certify that they meet, and will continue to meet, the requirements of the Medicare statute and regulations. 42 C.F.R. § 424.516(a)(1).

44.     As a prerequisite to Medicare payment under Medicare Part A, CMS also requires hospitals to submit annually a form CMS-2552, commonly known as a hospital cost report. A cost report is the final claim that a provider submits to a MAC for items and services rendered to Medicare beneficiaries during the year covered by the report.

45.     After the end of each of a hospital's fiscal years, the hospital files its hospital cost report with the MAC, stating the amount of Part A reimbursement the provider believes it is due for the year, or the amount of excess reimbursement it has received through interim payments during the year that it owes back to Medicare. *See* 42 U.S.C. § 1395g(a); 42 C.F.R. § 413.20. *See also* 42 C.F.R. § 405.1801(b)(1). Medicare relies upon the hospital cost report to determine whether the provider is entitled to more reimbursement than already received through interim payments, or whether the provider has been overpaid and must reimburse Medicare. *See* 42 C.F.R. §§ 405.1803, 413.60 and 413.64(f)(1).

46.     Medicare Part A payments for Social Security Act section 1886(d) hospital services, *see* 42 U.S.C. § 1395ww, are determined under a prospective payment system using the

9

claims submitted by the provider for particular patient discharges (specifically listed on UB-92s and UB-04s) during the course of the fiscal year. On the hospital cost report, the prospective payments for services are added to any other Medicare Part A add-on payments due to the provider. This total determines Medicare's liability for services rendered to Medicare Part A beneficiaries during the course of a fiscal year. From this sum, the payments made to the provider during the year are subtracted to determine the amount due the Medicare Part A program or the amount due the provider.

47.     Every hospital cost report contains a "Certification" that must be signed by the chief administrator of the provider or a responsible designee of the administrator.

48.     That chief administrator or designee is required to certify, in pertinent part:

> [T]o the best of my knowledge and belief, it [the hospital cost report] is a true, correct and complete statement prepared from the books and records of the provider in accordance with applicable instructions, except as noted. I further certify that I am familiar with the laws and regulations regarding the provision of health care services, and that the services identified in this cost report
>
> were provided in compliance with such laws and regulations.

49.     The hospital cost report certification page also includes the following notice:

> Misrepresentation or falsification of any information contained in this cost report may be punishable by criminal, civil and administrative action, fine and/or imprisonment under federal law. Furthermore, if services identified in this report were provided or procured through the payment directly or indirectly of a kickback or where otherwise illegal, criminal, civil and administrative action, fines and/or imprisonment may result.

50.     Thus, a provider must certify (1) that the filed hospital cost report is truthful, i.e., that the cost information contained in the report is true and accurate; (2) that it is correct, i.e., that the provider is entitled to reimbursement for the reported costs in accordance with applicable instructions; (3) that it is complete, i.e., that the hospital cost report is based upon all information known to the provider; and (4) that the services provided in the cost report were billed in

compliance with applicable laws and regulations, including the Stark Law.

51.     A hospital is required to disclose all known errors and omissions in its claims for Medicare Part A reimbursement (including its cost reports) to its MAC.

52.     Medicare, through its MACs, has the right to audit a provider hospital's cost reports and financial representations to ensure their accuracy and preserve the integrity of the Medicare Trust Funds. This right includes the right to make retroactive adjustments to hospital cost reports previously submitted by a provider if any overpayments have been made. *See* 42 C.F.R. § 413.64(f).

53.     Congress created Medicaid at the same time it created Medicare in 1965 by adding Title XIX to the Social Security Act.  Medicaid is a public assistance program that provides payment of medical expenses primarily for low-income patients. Funding for Medicaid is shared between the federal and the state governments.  The federal government also separately matches certain state expenses incurred in administering the Medicaid program.  While specific Medicaid coverage guidelines vary from state to state, Medicaid's coverage is generally modeled after Medicare's coverage. According to CMS, "[w]hen services are furnished through institutions that must be certified for Medicare, the institutional standards must be met for Medicaid as well."

54.     At all relevant times, Medicaid was intended to assist the poor and other qualified persons in paying for healthcare costs. Medicaid is a federal-state matching program, in which both the federal and state governments are required to contribute a specified percentage of total expenditures.

55.     Medicaid is administered by the individual states.

56.     The Social Security Act and federal regulations establish minimum levels of coverage that states must provide to operate a Medicaid program.  Federal law and regulations also establish

optional coverage categories, all or part of which states may choose to cover. Each state covers the required services and eligibility groups, but develops a unique program by determining which optional services and eligibility groups to cover.

57.    While states are responsible for the operation of Medicaid, the federal government plays an active role in overseeing Medicaid. CMS oversees Medicaid, and federal Medicaid regulations require each state to designate a single state agency responsible for Medicaid.

58.    The Medicaid programs in Pennsylvania and New Jersey work by reimbursing healthcare providers for the cost of services and ancillary items at fixed rates and in a manner similar to that used by Medicare.

59.    The Federal Employees Health Benefits Program ("FEHBP") provides health insurance coverage for more than 8 million federal employees, retirees, and their dependents. FEHBP is a collection of individual health care plans, including Blue Cross and Blue Shield plans, Government Employees Hospital Association, and Rural Carrier Benefit Plan. FEHBP plans are managed by the U.S. Office of Personnel Management.

60.    TRICARE is a federal program which provides civilian health benefits for military personnel, certain military retirees, and their families. TRICARE is administered by the Department of Defense and funded by the federal government.

61.    At all relevant times to the Amended Complaint, applicable TRICARE regulations relating to coverage of claims by providers and physicians have been substantially similar in all material respects to the applicable Medicare provisions described above.

62.    Medicare, Medicaid, TRICARE, and FEHBP and other similar federal and state medical insurance programs are referred to collectively herein as "Government Healthcare Programs."

**III.    The Stark Law**

63.     Enacted as amendments to the Social Security Act, the physician self-referral law, commonly referred to as the "Stark Law," prohibits hospitals and other entities providing "designated health services" ("DHS"), as defined in 42 U.S.C. § 1395nn(h)(6) and 42 C.F.R.

§ 411.351, from submitting Medicare claims for such services as a result of patient referrals from a physician who has a "financial relationship" (as defined in the statute and regulations) with the hospital that does not satisfy the requirements of an applicable exception, and prohibits Medicare from paying such claims.

64.     As initially enacted in 1989, the Stark Law applied to referrals of Medicare patients for clinical laboratory services made on or after January 1, 1992, by a physician to a laboratory with which the physician had a financial relationship unless a statutory or regulatory exception applied. *See* Omnibus Budget Reconciliation Act of 1989, P.L. 101-239, § 6204. In 1993, Congress extended the Stark Law's application to referrals for ten additional DHS. *See* Omnibus Reconciliation Act of 1993, P.L. 103-66, § 13562, Social Security Act Amendments of 1994, P.L. 103-432, § 152. In 2008, Congress added outpatient speech-language pathology services to the list of DHS. *See* Medicare Improvements for Patients and Providers Act of 2008, P.L. 110-275, § 143.

65.     The Stark Law was designed specifically to prevent patient steering, stinting on care, and losses that might be suffered by the Medicare program due to questionable utilization of DHS, as well as to address costs to the healthcare system as a whole.

66.     In pertinent part, the Stark Law provides:

- Prohibition of certain referrals

    (1)    In general

        Except as provided in subsection (b) of this section, if a physician . . . has a financial relationship with an entity specified in paragraph (2), then –

> (A)  the physician may not make a referral to the entity for the furnishing of designated health services for which payment otherwise may be made under this subchapter, and
>
> (B)  the entity may not present or cause to be presented a claim under this subchapter or bill to any individual, third party payor, or other entity for designated health services furnished pursuant to a referral prohibited under subparagraph (A).

42 U.S.C. § 1395nn(a)(1).

67.    "Designated health services" include inpatient and outpatient hospital services, and radiology and laboratory services. *See* 42 U.S.C. § 1395nn(h)(6).

68.    "Financial relationships" include "compensation arrangements" involving the payment of remuneration directly or indirectly to a referring physician, as defined in 42 U.S.C. § 1395nn(h)(1)(A) and (h)(1)(B) and 42 C.F.R. § 411.354(c).

69.    The Stark Law explicitly states that Medicare may not pay for any DHS referred in violation of the statute. *See* 42 U.S.C. § 1395nn(g)(1). In addition, the regulations implementing the Stark Law expressly require that any entity collecting payment for DHS "performed under a prohibited referral must refund all collected amounts on a timely basis." 42 C.F.R. § 411.353(d) (2006).

70.    The Stark Law and its companion regulations set forth exceptions for certain financial relationships that meet specific enumerated requirements. The Stark Law's exceptions operate as affirmative defenses to alleged violations of the statute. To invoke an exception successfully, a defendant bears the burden of proving compliance with every requirement of that exception.

71.    The Stark Law and its companion regulations set forth exceptions for, among other things, "*bona fide* employment relationships," "personal service arrangements," "rental of equipment," and "indirect compensation arrangements."

14

72.    To qualify for the Stark Law's exception for *bona fide* employment relationships, a compensation arrangement must meet the following requirements:

(A) the employment is for identifiable services;

(B) the amount of the remuneration under the employment—

(i) is consistent with the fair market value of the services; and

(ii) is not determined in a manner that takes into account (directly or indirectly) the volume or value of any referrals by the referring physician;

(C) the remuneration is provided pursuant to an agreement which would be commercially reasonable even if no referrals were made to the employer; and

(D) the employment meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(2); *see also* 42 C.F.R. §§ 411.357(c), 411.354(d)(4).

73.    To qualify for the Stark Law's exception for personal service arrangements, a compensation arrangement must meet the following statutory requirements:

(i) the arrangement is set out in writing, signed by the parties, and specifies the services covered by the arrangement;

(ii) the arrangement covers all of the services to be provided by the physician (or an immediate family member of such physician) to the entity;

(iii) the aggregate services contracted for do not exceed those that are reasonable and necessary for the legitimate business purposes of the arrangement;

(iv) the term of the arrangement is for at least 1 year;

(v) the compensation to be paid over the term of the arrangement is set in advance, does not exceed fair market value, and except in the case of a physician incentive plan described in subparagraph (B), is not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties;

(vi) the services to be performed under the arrangement do not involve the counseling or promotion or a business arrangement or other activity that violates any State or Federal law; and

(vii) the arrangement meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(3)(A); *see also* 42 C.F.R. §§ 411.357(d), 411.354(d)(4).

74.    To qualify for the Stark Law's exception for rental of equipment, a compensation arrangement must meet the following statutory requirements:

(i) the lease is set out in writing, signed by the parties, and specifies the equipment covered by the lease,

(ii) the equipment rented or leased does not exceed that which is reasonable and necessary for the legitimate business purposes of the lease or rental and is used exclusively by the lessee when being used by the lessee,

(iii) the lease provides for a term of rental or lease of at least 1 year,

(iv) the rental charges over the term of the lease are set in advance, are consistent with fair market value, and are not determined in a manner that takes into account the volume or value of any referrals or other business generated between the parties,

(v) the lease would be commercially reasonable even if no referrals were made between the parties, and

(vi) the lease meets such other requirements as the Secretary may impose by regulation as needed to protect against program or patient abuse.

42 U.S.C. § 1395nn(e)(1)(B); *see also* 42 C.F.R. § 411.357(b).

75.    To qualify for the Stark Law's exception for indirect compensation arrangements, a compensation arrangement must meet the following regulatory requirements:

(1)

(i) The compensation received by the referring physician (or immediate family member) described in § 411.354(c)(2)(ii) is fair market value for services and items actually provided and not determined in any manner that takes into account the volume or value of referrals or other business generated by the referring physician for the entity furnishing DHS.

(ii) Compensation for the rental of office space or equipment may not be determined using a formula based on -

(A) A percentage of the revenue raised, earned, billed, collected, or otherwise attributable to the services performed or business generated in the office space or to the services performed on or business generated through the use of the equipment; or

13

(B) Per-unit of service rental charges, to the extent that such charges reflect services provided to patients referred by the lessor to the lessee.

(1) The compensation arrangement described in § 411.354(c)(2)(ii) is set out in writing, signed by the parties, and specifies the services covered by the arrangement, except in the case of a bona fide employment relationship between an employer and an employee, in which case the arrangement need not be set out in writing, but must be for identifiable services and be commercially reasonable even if no referrals are made to the employer.

(2) The compensation arrangement does not violate the anti-kickback statute (section 1128B(b) of the Act), or any Federal or State law or regulation governing billing or claims submission.

42 C.F.R. § 411.357(p); *see also* 42 C.F.R. § 411.354(d)(4).

## DEFENDANTS' FRAUDULENT SCHEMES

### A. Easton Hospital's Financial Issues and Dr. Ailawadi Joins Easton Hospital

76.     Easton Hospital has recently experienced significant financial difficulties.

77.     For example, Easton Hospital shrank from 254 beds to 196 beds from 2016 to 2017, when Steward acquired it.

78.     The Hospital also scaled back the workforce to 837 full- and part-time jobs. In 2012 and 2013, the hospital employed 1,267 full- and part-time workers, according to the Pennsylvania Health Department.

79.     Admissions and patient revenue at the Hospital have steadily declined. In the 2013 fiscal year, there were approximately 8,600 admissions, according to the Pennsylvania Health Department. In 2017, that number was less than 6,400, a decrease of 37%.

80.     Patient revenue fell from $181 million in fiscal 2014 to $163 million in fiscal 2017, according to the Pennsylvania Health Care Cost Containment Council.

81.     Because Easton Hospital and Dr. Ailawadi's practice are situated in a relatively economically underprivileged area, with little availability of private insurance, a significant portion of the medical services provided by the Defendants are paid by Medicare or Medicaid.

18

82.     Indeed, Relator estimates that more than 80% of Dr. Ailawadi's patients are beneficiaries of a Government Healthcare Program.

83.     Moreover, upon information and belief, Dr. Ailawadi targets low-income individuals in Allentown and surrounding areas.  In fact, Relator has been told that Dr. Ailawadi "intimidates" and frightens patients into agreeing to the surgery(ies) he recommends.

84.     Dr. Ailawadi exhibits patient profiling.  He appears to prey on a low-income population with government-aided health insurance who are less educated and vulnerable to the direction of a medical professional/surgeon.

85.     Dr. Ailawadi began performing surgeries at Easton Hospital in December 2018.

86.     A June 6, 2019 press release from Easton Hospital states:

> Thousands of people across the Lehigh Valley have already discovered **Lehigh Valley Weight Loss, which is the largest medical and surgical weight loss program in the area**. Still, it might be safe to say that for many others, it's the area's best-kept healthcare secret.

> John Scaffidi, MD, FABOM, FACOG and Maneesh Ailawadi, MD, FSSO were the first to perform outpatient bariatric surgery in the state, and have realized the importance of becoming what they call the "primary caregiver" for patients' weight loss journeys. Scaffidi, who has three decades of experience in obstetrics and gynecology, consistently saw patients come into his practice who either didn't qualify for weight loss surgery, or didn't want it. The goal for him became providing his patients with a way to get the medical component of weight loss taken care of before surgery could even be an option.

> Enter Dr. Ailawadi, who had opened his own private practice performing bariatric surgery, general surgery, and surgical oncology. Four years ago, the two physicians began working together to provide a truly unique full-service center that presents patients with a multidisciplinary approach to weight loss. Their collaborative effort also brings patients into the fold of Easton's weight loss program for the surgical component.

*See* https://www.easton-hospital.org/newsroom/2019-06-06/multi-disciplinary-approach-individualized-weight-loss (emphasis added) (last visited on August 14, 2019).

87.     Due to his consistent and significant number of procedures, *see infra* below, Easton Hospital has provided Dr. Ailawadi with three days of OR time – up from one day when he started:

➢ December 2018 - Dr. Ailawadi began performing surgeries at Easton Hospital in one operating room every Monday.

➢ Mid-March 2019 – Easton Hospital provided Dr. Ailawadi with the use of two operating rooms on Mondays at the same time so he could perform multiple procedures consecutively.  Many of his surgeries actually overlap.

➢ April 2019 - Easton Hospital provided Dr. Ailawadi with additional time in an operating room on Tuesdays.

➢ May 2019 - Easton Hospital provided Dr. Ailawadi with additional time in two operating rooms on the second and fourth Fridays of every month

88.     At a Spring 2019 scheduling meeting, the CEO and President at Easton Hospital (Linda J. Grass, MBA, FACHE) insisted that Easton Hospital provide Dr. Ailawadi the requested third day of surgery in light of two factors – (1) Dr. Ailawadi's promise to bring more surgeries to Easton and (2) Dr. Ailawadi's threat that he would move his surgical practice to Lehigh Valley Medical Center if we was not provided with more OR time at Easton Hospital.

89.     Both the President and former CMO (Lisa Esolen, MD) at Easton Hospital have advocated for providing Dr. Ailawadi with additional OR blocks because he told them he would bring all his surgery cases from Lehigh Valley Hospital

90.     Prior to Easton Hospital, Dr. Ailawadi practiced at Sacred Heart Hospital in Allentown, Pennsylvania.

**B. Dr. Ailawadi's Illegal Behavior at Easton Hospital**

91.     Upon information and belief, since December 2018, Dr. Ailawadi has performed more than 250 procedures at Easton Hospital, including more than 100 laparoscopic sleeve gastrectomy with liver biopsy procedures, more than 130 esophagogastroduodenoscopies ("EGDs") and more than 50 other surgeries, including laparoscopic cholecystectomies and hernia procedures.

92.     Dr. Ailawadi has performed numerous EGDs in preparation for the more significant procedures; the vast majority of his EGD procedures are "with biopsy", which requires Dr. Ailawadi to take a tissue samples during the scope.

93.     EGD procedures are routinely performed prior to bariatric surgery to evaluate potential risk factors before the surgery. The rationale for performing an EGD before bariatric surgery is to detect and/or treat lesions that might potentially affect the type of surgery performed, including causing complications in the immediate postoperative period or resulting in symptoms after surgery.

94.     A laparoscopic sleeve gastrectomy is a procedure in which a portion of the stomach is surgically removed.  The procedure is performed on obese and morbidly obese patients to cause weight loss and resolve or improve overall health with respect to related co-morbidities such as diabetes, sleep apnea, osteoarthritis, gastroesophageal reflux disease and hypertension. The procedure is typically performed laparoscopically and is non-reversible.  (It is referred to as a "sleeve gastrectomy" because of the sleeve that is formed by surgically stapling the edges of the stomach.).

95.     Sleeve gastrectomy procedures can be open or laparoscopic.

96.     Open sleeve gastrectomy procedures are not covered for Medicare beneficiaries.

97.     Laparoscopic sleeve gastrectomy procedures have been approved by Medicare since June 2012 when the following conditions are met:

> Effective for services performed on and after June 27, 2012, A/B Medicare Administrative Contractors (A/B MACs) acting within their respective jurisdictions may determine coverage of **stand-alone laparoscopic sleeve gastrectomy (LSG)** for the treatment of co-morbid conditions related to obesity in Medicare beneficiaries only when all of the following conditions a.-c. are satisfied.
>
> **a. The beneficiary has a body-mass index (BMI) $\geq$ 35 kg/m$^2$,**
> **b. The beneficiary has at least one co-morbidity related to obesity, and,**
> **c. The beneficiary has been previously unsuccessful with medical treatment for obesity.**
>
> The determination of coverage for any bariatric surgery procedures that are not specifically identified in an NCD as covered or non-covered, for Medicare beneficiaries who have a body-mass index $\geq$ 35, have at least one co-morbidity related to obesity, and have been previously unsuccessful with medical treatment

for obesity, is left to the local MACs.

> Where weight loss is necessary before surgery in order to ameliorate the complications posed by obesity when it coexists with pathological conditions such as cardiac and respiratory diseases, diabetes, or hypertension (and other more conservative techniques to achieve this end are not regarded as appropriate), supplemented fasting with adequate monitoring of the patient is eligible for coverage on a case-by-case basis or pursuant to a local coverage determination. The risks associated with the achievement of rapid weight loss must be carefully balanced against the risk posed by the condition requiring surgical treatment

Medicare National Coverage Determinations Manual, Chapter 1, Part 2 (Sections 90-160.26), at 100.1 (emphasis added).

98.    TRICARE also covers both open and laparoscopic sleeve gastrectomy procedures.

*See* https://www.tricare.mil/CoveredServices/IsItCovered/BariatricSurgery.aspx.

99.    Easton uses the following CPT codes for the primary procedures at issue in the scheme – CPT 43239 (EGD) and CPT 43775 (sleeve gastrectomy).

100.    Dr. Ailawadi is performing the majority of his EGDs (even those EGDs with biopsy) in 3-4 minutes in order to perform more procedures and move the patients quickly through the Operating Room ("OR"). Relator believes, and medical journals support, that EGD procedures should take 15-30 minutes per procedure.  Accordingly, Dr. Ailawadi's EGDs appear to be medically inadequate.

101.    From December 2018 through early June 2019, Dr. Ailawadi performed the following procedures in four minutes or less:

|  | Procedures lasting 1 minute or less | Procedures lasting 2 minutes | Procedures lasting 3 minutes | Procedures lasting 4 minutes |
|---|---|---|---|---|
|  |  |  |  |  |
| EGD Diagnostic | 4 | 1 | n/a | n/a |

22

| EGD with Biopsy | 10 | 20 | 30 | 38 |
| Colonoscopy | n/a | 1 | n/a | n/a |

102.    The risks of surgery are compounded by a hospital's failure to follow Medicare and Medicaid rules, including those requiring adequate coverage of surgeries by qualified physicians.

103.    Moreover, upon information and belief, Dr. Ailawadi is manufacturing medical necessity, often with the assistance of Dr. Scaffidi.

104.    For example, Dr. Ailawadi scheduled a procedure for a 15-year old female in June 2019, and used the following language from his History and Physical

> The patient is interested in bariatric surgery due to difficulty managing their weight **over a decade**. . . . They have failed multiple weight loss programs in the past.

(emphasis added). [2]

105.    Dr. Ailawadi uses that same boilerplate language for virtually every patient, even ones in their teens.

106.    In addition, Dr. Ailawadi appears to have a scheme in place to utilize the same medical professionals (nutrition, psychology, sleep study) to accelerate these patients through the condition requirements and approval processes in order to obtain consent for his bariatric surgeries.

107.    For example, on June 3, 2019, Dr. Ailawadi saw at least nine patients that he eventually scheduled for surgery:

---

[2] Dr. Ailawadi's medical notes for this patient also claim that he spent 1.5 hours with the patient explaining the procedure, obesity and other surgical options.  Relator believes that it is impossible for Dr. Ailawadi to have spent 1.5 hours with any patient due to the volume of patients he sees per day.

|  | Sex and Age of Patient | Minutes allegedly spent discussing instructions re operation | Minutes allegedly spent discussing obesity | Minutes allegedly spent discussing risks, benefits and options of procedure | Minutes allegedly spent discussing surgical options for weight loss |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| D.H. | F, 19 | 30 | 45 | 60 |  |
| S.V. | F, 30 | 30 |  | 60 |  |
| A.R. | F, 28 | 30 | 15 | 60 |  |
| A.R. | F, 33 | 30 |  | 60 |  |
| F.G. | F, 15 | 30 |  | 60 |  |
| E.R. | F, 34 | 30 |  | 60 |  |
| M.A. | F, 53 | 30 | 15 | 60 |  |
| N.P. | F, 59 | 30 |  | 60 |  |
| Y.M. | F, 39 | 30 |  | 60 |  |
|  |  |  |  |  |  |

108. Thus, conservatively, on June 3, 2019, Dr. Ailawadi spent nine hours with nine patients.  However, by his notes, he spent 14.45 hours with the nine patients

109. Similarly, Dr. Ailawadi's signed History and Physical examination forms report the following for June 6, 2019:

|  | Sex and Age of Patient | Minutes allegedly spent discussing instructions re operation | Minutes allegedly spent discussing obesity | Minutes allegedly spent discussing risks, benefits and options of procedure | Minutes allegedly spent discussing surgical options for weight loss |
|---|---|---|---|---|---|
|  |  |  |  |  |  |
| I.A. | F, 28 | 30 | 45 | 60 |  |
| J.D. | M, 43 | 30 |  | 60 |  |
| L.E.R. | F, 45 | 30 |  | 60 |  |
| J.G. | M, 40 | 30 |  | 60 |  |
| Y.O. | F, 61 |  | 45 | 60 | 60 |
| Y.R.R. | F, 36 |  | 45 | 45 | 60 |
| K.R. | F, 19 | 30 |  | 60 |  |
| P.R. | M, 40 | 30 |  | 60 |  |

| S.S. | F, 40 | | 45, then mention of 20 | 45 | 20 |
|------|-------|--|------------------------|----|----|
| | | | | | |

110.     Thus, on June 6, 2019, Dr. Ailawadi spent at least 8.5 hours with nine patients.  By his notes, he spent more than 16 hours with the nine patients.

111.     Dr. Ailawadi's stated office hours are as follows:

- Easton office – Mondays – 4:30-7 pm

- Allentown office – Thursdays – 9:30 am to 3:30 pm

112.     Virtually every patient approved by Dr. Ailawadi for a bariatric procedure has first been referred "to Dr. Scaffidi for a medical weight loss program."

113.     As stated above, it is necessary for a bariatric surgery that the patient have attempted and/or been prescribed a weight loss plan and been unsuccessful with medical treatment for obesity.

114.     By utilizing Dr. Scaffidi and partnering in Lehigh Valley Weight Loss, Dr. Ailawadi is ensuring that his patients will meet one of the requirements for surgery when they inevitably fail the program, if such a program even exists or is implemented.

115.     Additionally, on at least two occasions that Relator observed, the BMI (as noted above, necessary for approval of procedure) listed on Dr. Ailawadi's office notes was substantially higher than the BMI noted at Easton Hospital only eleven days later for sleeve gastrectomy procedures:

| Patient Initials | Sex and Age of Patient | Internal Medical Record Number (specific to patient) | BMI reported by Dr. Ailawadi on June 6, 2019 in his History & Physical | BMI based on assessment at hospital at time of admission on June 17, 2019 |
|------------------|------------------------|------------------------------------------------------|-------------------------------------------------------------------------|----------------------------------------------------------------------------|
| | | | | |
| P.R. | M, 40 | EH35005435 | 47.01 | 39.9 |
| I.A. | F, 28 | EH35006477 | 40.78 | 36.0 |

25

116.    Dr. Ailawadi performed sleeve gastrectomy procedures on at least five other patients with BMIs lower than the required 35 kg/m$^2$:

| Patient Initials | Date | Internal Medical Record Number (specific to patient) | BMI based on assessment at hospital at time of admission |
|---|---|---|---|
|  |  |  |  |
| T.B. | 12/17/18 | EH 35001715 | 31.2 |
| A.O.L. | 1/7/19 | EH35002418 | 32.0 |
| A.G. | 2/4/19 | EH35003229 | 31.8 |
| L.G.V. | 4/8/19 | EH35004291 | 29.8 |
| L.G. | 4/29/19 | EH35005127 | 30.9 |

117.    Moreover, Easton Hospital's operating room schedules make clear that Dr. Ailawadi often perform surgeries and/or EGDs simultaneously or in too short a time for a proper procedure. Relator observed that Easton Hospital's operating room schedule for numerous dates in 2019 demonstrates several instances of Dr. Ailawadi covering multiple surgeries at once.

118.    For example, on June 7 and 11, 2019, Dr. Ailawadi performed the following procedures:

| Operating Room | Patient Initials | Procedure | Start Time | End Time |
|---|---|---|---|---|
|  |  |  |  |  |
| **6-7-19** |  |  |  |  |
| 3 | A.R. | "Laparoscopic Sleeve Gastrectomy, introp EGD, LAP liver bx" | 8:16 | 9:35 |
| 5 | D.H. | "Laparoscopic Sleeve Gastrectomy, LAP liver bx" | 9:44 | 11:01 |
| 3 | S.V. | "Laparoscopic Sleeve | 10:59 | 12:11 |

|   |   | Gastrectomy, LAP liver bx" |   |   |
|---|---|---|---|---|
| 2 | G.S.T. | EGD with Biopsy | 12:15 | 12:18 |
| 1 | A.P. | EGD with Biopsy | 12:31 | 12:35 |
| 2 | J.P. | EGD with Biopsy | 12:38 | 12:42 |
| 1 | K.M. | EGD with Biopsy | 12:56 | 12:59 |
| 1 | H.O. | EGD with Biopsy | 13:02 | 13:06 |
|   |   |   |   |   |
| **6-11-19** |   |   |   |   |
| 5 | N.A. | Laparoscopic Sleeve Gastrectomy | 8:04 | 9:08 |
| 2 | E.F. | Laparoscopic Cholecystectomy | 9:13 | 10:59 |
| 5 | M.A. | Laparoscopic Sleeve Gastrectomy, Laparoscopic Liver Biopsy | 10:59 | 11:54 |
| 2 | C.R. | Laparoscopic Cholecystectomy | 12:06 | 13:04 |
| 1 | B.S. | Colonoscopy | 13:00 | 13:21 |

119.    While only two of these procedures overlapped in time, the condensed time between surgeries demonstrates Dr. Ailawadi's urgency to perform as many surgeries in a day as possible.

120.    CMS regulations provide that a teaching attending physician must be present for the critical or key elements of each surgery.  He or she may only leave the first surgery when the key or critical elements *are completed*.  (Residents or fellows may finish the non-critical parts.)[3]

---

[3] MS Manual System, Pub 100-04 Medicare Claims Processing (Transmittal 2303) (Sept. 14, 2011) (hereafter "CMS 2011 Claims Manual") at 100.1.2 (Surgical Procedures) (available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/Downloads/R2303CP.pdf)

121.    Surgeries in compliance with this rule are often called overlapping surgeries.

122.    Even after the attending has left, CMS requires him/her to have arranged for another qualified surgeon to be immediately available to assist in the first case should the need arise.[4]

123.    CMS will not pay for surgeries where the key or critical elements of each surgery take place at the same time (generally called concurrent surgeries).

124.    At all relevant times, Defendants acted knowingly – that is, with actual knowledge, with deliberate ignorance, or with reckless disregard – with respect to the fact that they were submitting false claims to Medicare as alleged here; that Defendants were making false records or statements material to false claims or to get claims paid; and that Defendants were making false records or statements material to an obligation to refund money to the United States, or knowingly concealing or avoiding such an obligation.

125.    At all relevant times, Defendants were familiar with the requirements of the Stark Law and the FCA, as evidenced, among other things, by their certifications in the Medicare enrollment applications and hospital cost reports described above.

126.    At all times relevant to this Complaint, Defendants sought reimbursement from the Medicare and Medicaid programs and knew of the policies, procedures and criteria for obtaining lawful reimbursement under these programs.  Defendants knowingly violated such policies, procedures and criteria in order to fraudulently obtain greater reimbursement payments than they were entitled to receive.

127.    The fact that Defendants' Medicare claims at issue were not permissible was material to Medicare's decision whether to pay those claims.

_____

(last visited on August 23, 2019).
[4]  *See id.*

128.    Defendants' false representations in their Medicare enrollment forms and cost reports were material to Medicare's decision whether to pay Defendants' claims; were intended to induce Medicare to pay those claims; were material to Easton Hospital's obligation to refund improper reimbursements to the United States; and concealed and avoided that obligation.

129.    Defendants understood at all times relevant to this lawsuit the above-described materiality of compliance with the Stark Law and their certifications of compliance therewith.

130.    As noted above, on its provider enrollment form and elsewhere, CMS classifies compliance with both the Stark Law as conditions of payment for Medicare claims.

131.    Compliance with both the Stark Law goes to the essence of Medicare's bargain with participating healthcare providers. Both play a key role in ensuring that services are reasonable and necessary, and not provided merely to enrich the parties to an unlawful arrangement at the expense of federal health programs and their beneficiaries.

132.    The violations alleged here are not minor or insubstantial. Instead, the ways in which Defendants violated the Stark Law implicate the core concerns of those statutes, including because Defendants directly incentivized and paid physicians, through reciprocal referrals, in return for increased referrals to Easton Hospital.

133.    Upon information and belief, no federal or state government payer has paid claims with actual knowledge that Defendants violated governing regulations and conditions of payment or participation.

## FIRST CAUSE OF ACTION
(False Claims Act:  Presenting and Causing False Claims)
(31 U.S.C. § 3729(a)(1) (claims up to and through May 29, 2009)
and 31 U.S.C. § 3729(a)(1)(A) (claims from and after May 30, 2009))
(All Defendants)

134.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

135.     Defendants presented and/or caused to be presented, materially false and fraudulent claims for payment or approval to the United States, including claims to the Medicare program for reimbursement of services rendered to patients who were referred in violation of the Stark Law.

136.     Defendants presented or caused to be presented such claims with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

137.     The United States sustained damages because of Defendants' wrongful conduct.

## SECOND CAUSE OF ACTION
(False Claims Act: False Statements Material to False Claims)
(31 U.S.C. § 3729(a)(2) (claims up to and through June 6, 2008)
and 31 U.S.C. § 3729(a)(1)(B) (claims from and after June 7, 2008))
(All Defendants)

138.     Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

139.     Defendants made, used, and caused to be made or used false records or statements – i.e., the false certifications and representations made and caused to be made by Defendants when submitting the false claims for payments and the false certifications made by Defendants in submitting Easton Hospital's enrollment agreements and annual cost reports – to get false or fraudulent claims paid and approved by the United States, and that were material to the United States' payment of the false claims at issue in this case.

140.     Defendants' false certifications and representations were made for the purpose of getting false or fraudulent claims paid by the United States, and payment of the false or fraudulent claims by the United States was a reasonable and foreseeable consequence of Defendants' statements and actions.

141.     The false certifications and representations made and caused to be made by Defendants were material to the United States' payment of the false claims.

142.     Defendants made or caused such false records or statements with actual knowledge

of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

143.    The United States sustained damages because of Defendants' wrongful conduct.

### THIRD CAUSE OF ACTION
(False Claims Act: False Records Material to Obligation to Pay)
(31 U.S.C. § 3729(a)(7) (claims up to and through May 29, 2009)
and 31 U.S.C. § 3729(a)(1)(G) (claims from and after May 30, 2009))
(All Defendants)

144.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

145.    Defendants made and used or caused to be made or used false records or statements, including Easton Hospital's enrollment agreements and annual cost reports, material to an obligation to pay or transmit money to the United States, or knowingly concealed, avoided, or decreased an obligation to pay or transmit money to the United States.

146.    Defendants made or caused such false records or statements with actual knowledge of their falsity, or with reckless disregard or deliberate ignorance of whether or not they were false.

147.    The United States sustained damages because of Defendants' wrongful conduct.

### FOURTH CAUSE OF ACTION
(Unjust Enrichment)
(Defendants)

148.    Relator incorporates by reference all paragraphs of this Complaint set out above as if fully set forth here.

149.    This is a claim for the recovery of monies by which Defendants have been unjustly enriched at the expense of the United States.

150.    By directly or indirectly obtaining government funds to which it was not entitled, Defendants were unjustly enriched, and are liable to account for and pay as restitution such amounts, or the proceeds therefrom, which are to be determined at trial, to the United States.

31

## PRAYER FOR RELIEF

The United States demands and prays that judgment be entered in its favor against Defendants as follows:

151.    On the First Count under the False Claims Act, against all Defendants, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

152.    On the Second Count under the False Claims Act, against all Defendants, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

153.    On the Third Count under the False Claims Act, against all Defendants, for the amount of the United States' damages, trebled as required by law, and such civil penalties as are authorized by law, together with all such further relief as may be just and proper.

154.    On the Fourth Count for payment by mistake, against all Defendants, for the damages sustained and/or amounts by which they were unjustly enriched or by which all Defendants retained illegally obtained monies, plus interest, costs, and expenses, and for all such further relief as may be just and proper.

## DEMAND FOR JURY TRIAL

Relator, on behalf of the United States, demands a jury trial in this case.


Dated: August 26, 2019                    Respectfully submitted,

                                          **ROSS FELLER CASEY, LLP**

                              By: _____

                                          Brian J. McCormick, Jr., Esquire
                                          Dena R. Young, Esquire
                                          One Liberty Place
                                          1650 Market Street, 34th floor
                                          Philadelphia, PA  19103
                                          Tel.: (215) 574-2000
                                          Fax: (215) 574-3080
                                          bmccormick@rossfellercasey.com